# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:08-cv-138-RJC

| | |
|---|---|
| JAMEY LAMONT WILKINS, | ) |
| Plaintiff, | ) |
| v. | ) ORDER |
| OFFICER GADDY, | ) |
| Defendant. | ) |

**THIS MATTER** comes before the Court upon Defendant Gaddy's Motion for Summary Judgment, (Doc. No. 38).

## I.     BACKGROUND

### A.     Procedural Background

On March 27, 2008, Plaintiff Jamey Lamont Wilkins ("Plaintiff" or "Wilkins") filed this action, proceeding pro se, pursuant to 42 U.S.C. § 1983. In his Complaint, (Doc. No. 1), Plaintiff, a North Carolina state prisoner, alleged that Defendant, Corrections Officer Alexander Gaddy ("Defendant" or "Gaddy"), subjected him to cruel and unusual punishment in violation of the Eighth Amendment.

On April 16, 2008, acting sua sponte, the Honorable Graham C. Mullen ("Judge Mullen") dismissed the action for failure to state a claim, finding that Plaintiff had not alleged any more than a de minimis physical injury. (Doc. No. 3). Plaintiff subsequently filed a Motion for Reconsideration, (Doc. No. 5), and a Motion for Leave to File an Amended Complaint, (Doc. No. 8), both of which were denied. See (Doc. No. 10). On September 3, 2008, Plaintiff appealed the denial of his Motions to the U.S. Court of Appeals for the Fourth Circuit. (Doc.

No. 11). On January 23, 2009, the Fourth Circuit affirmed the decisions of the district court. (Doc. No. 15).

Plaintiff then filed a petition for certiorari in the U.S. Supreme Court. Writing per curiam, the Supreme Court reversed the Fourth Circuit's decision, ruling that longstanding Fourth Circuit precedent on excessive force claims had misapplied the rule stated in Hudson v. McMillian, 503 U.S. 1 (1992). See Wilkins v. Gaddy, 130 S. Ct. 1175 (2010). The Supreme Court explained:

> In Hudson v. McMillian, 503 U.S. 1, 4 (1992), this Court held that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." In this case, the District Court dismissed a prisoner's excessive force claim based entirely on its determination that his injuries were " de minimis." Because the District Court's approach, affirmed on appeal, is at odds with Hudson's direction to decide excessive force claims based on the nature of the force rather than the extent of the injury, the petition for certiorari is granted, and the judgment is reversed.

Id. at 1176-77.

As a result of the Supreme Court's ruling, the Fourth Circuit remanded Plaintiff's case to the district court. (Doc. No. 20). On July 13, 2010, Judge Mullen ordered Defendant Gaddy to file an answer to Plaintiff's complaint, (Doc. No. 21), and on August 17, 2010, this case was reassigned to Chief Judge Robert J. Conrad, Jr.

On September 30, 2010, Plaintiff filed an Amended Complaint, this time represented by counsel. (Doc. No. 28). In his Amended Complaint, Plaintiff alleged that Defendant employed excessive force against him, without just cause and with malicious intent, thereby violating his Eighth Amendment rights. Plaintiff seeks compensatory and punitive damages, as well as costs and attorneys' fees. Defendant filed an Answer on November 1, 2010. (Doc. No. 29). The parties have completed discovery. See (Doc. No. 30). On August 30, 2011, Defendant filed a

Motion for Summary Judgment. (Doc. No. 37). On September 20, 2011, Plaintiff responded. (Doc. No. 39). The matter is ripe for adjudication. For the reasons that follow, the Court will **DENY** Defendant's Motion for Summary Judgment, (Doc. No. 37).

B.  Factual Background[1]

At all times relevant to this action, Wilkins was incarcerated by the North Carolina Department of Correction ("DOC") at Lanesboro Correctional Institution ("Lanesboro") in Polkton, North Carolina. (Doc. No. 40: Wilkins Decl. at ¶ 2). On June 13, 2007, Wilkins was located in the Anson Segregation Unit, as part of the maximum control unit at Lanesboro. (Id. at ¶ 3). He was located in cell block C and assigned to cell C-2. (Id.). On that day, Defendant Gaddy was working as a Corrections Officer at Lanesboro. (Id. at ¶ 2; Doc. No. 38-1: Gaddy Aff. at ¶ 3).

At around 1:30 p.m., Gaddy was taking another inmate, Timothy Kellam, from the recreation cage back to his cell. (Doc. Nos. 40: Wilkins Decl. at ¶ 4; 38-1: Gaddy Aff. at ¶ 10; 40-3: Dunning statement; 40-4: Kellam statement). As Gaddy took Kellam through the C block, Gaddy was yelling at the inmates, shouting insults and curses at them. (Doc. No. 40: Wilkins Decl. at ¶ 5). When Gaddy passed Wilkins's cell, Wilkins asked Gaddy to give him a grievance form because Wilkins wanted to report Gaddy's disrespectful behavior. (Id. at ¶ 6) ("I said something like: 'How are you gonna' come in here talking like that? Give me a grievance - I'm gonna' write you up!'"); (Doc. No. 40-3: Dunning statement) ("I heard the officer tell the inmate to shut up before he shut him up and make verbal threats towards the inmate. The inmate asked

---

[1] In analyzing Defendant Gaddy's Motion for Summary Judgment, the Court views all facts, and all inferences to be drawn from those facts, in the light most favorable to Plaintiff Wilkins as the nonmoving party.

3

for a grievance and the officer repeated his threat."); (Doc. No. 40-4: Kellam statement) ("Inmate Jamey Wilkins ask[ed] Officer Getty [sic] for a grievance form."); (Doc. No. 40-5: Wright statement) ("Wilkins told me to hold on with the conversation so he could ask officer Getty [sic] for a grievance form").

Gaddy responded to Wilkins's request by swearing and threatening him. (Doc. No. 40: Wilkins Decl. at ¶ 7) ("Gaddy said something to the effect of: 'Shut the f*ck up before I shut you up!'"); (Doc. No. 40-3: Dunning statement) ("I heard the officer tell the inmate to shut up before he shut him up and make verbal threats towards the inmate."); (Doc. Nos. 40-4: Kellam statement; 40-5: Wright statement). Gaddy continued to lead Kellam back to Kellam's cell. (Doc. No. 40: Wilkins Decl. at ¶ 10). As he did so, Gaddy continued shouting at Wilkins: "Keep running your f*cking mouth and I'll come down there and beat your a**! I'll pop your door, and I'll beat your a**!" (Id.).

After Gaddy finished placing Kellam into his cell, Gaddy returned to Wilkins's cell. (Id. at ¶ 11; Doc. Nos. 40-4: Kellam statement; 40-5: Wright statement). Gaddy continued yelling insulting and vulgar comments and threatening Wilkins. (Doc. No. 40: Wilkins Decl. at ¶ 11) ("When Gaddy was done putting Kellam back in his cell, Gaddy came back to my cell, saying stuff like: 'I'm back now! What's this sh*t you was talking about? I'm gonna f*ck you up.'")

Gaddy was not carrying a radio on this day. (Id. at ¶ 15; Doc. No. 38-1: Gaddy Aff. at ¶ 14). Because Gaddy had no radio to communicate with the control booth, he began to wave, whistle, and gesture at the control booth officer, Barker, in an evident attempt to get Barker to open Wilkins's cell door. (Doc. No. 40: Wilkins Decl. at ¶ 12). Then, Gaddy directed Wilkins to press the emergency call button. (Id. at ¶ 13; Doc. Nos. 40-4: Kellam statement; 40-5: Wright statement). Wilkins pressed the emergency call button. (Doc. No. 40: Wilkins Decl. at ¶ 13).

4

At this time, another officer, Wall, stuck his head into the C-block area to ask what was going on. (Id. at ¶ 14). Gaddy stated to Wall: "Oh nothing, I'm just about to handle a li'l business." (Id.). Wall left the area. (Id.).

Gaddy continued to wave and signal to the control booth officer, Barker. (Id. at 15; Doc. Nos. 40-3: Dunning statement; 40-5: Wright statement); (Doc. No. 40-1: Barker statement) ("I, C/O Barker, was in control room when C/O Gaddy signal for me to open cell door C-2 in C-Pod. I, C/O Barker, looked up into C-pod and saw that C-2's trap door was opened. I then opened cell C-2."). Wilkins's cell door opened. (Doc. Nos. 40: Wilkins Decl. at ¶ 16; 40-1: Barker statement; 40-3: Dunning statement; 40-4: Kellam statement; 40-5: Wright statement). As the cell door opened, Gaddy immediately grabbed Wilkins, picking him up in the air, and throwing him down onto the ground outside of cell C-2. (Doc. No. 40: Wilkins Decl. at ¶ 16) ("As my door slid open, it was like Gaddy was real anxious to come right in. . . . He snatches me up in the air and throws me down on the floor outside my cell."); (40-3: Dunning statement); (40-4: Kellam statement) ("I heard the door open and Inmate Wilkins screaming then I heard a hard thump."); (40-5: Wright statement) ("When Wilkins['s] door open, Officer Getty [sic] attacked Wilkins with aggressive force by picking him up side down and slamming him with all his weight onto the concrete floor.").

Gaddy was substantially larger than Wilkins in size: Gaddy was about 6'4" and 300 pounds, while Wilkins was about 5'11" and 145 pounds. (Doc. No. 40: Wilkins Decl. at ¶ 17). Once Wilkins was on the ground, Gaddy pinned him, and began to assault Wilkins. (Doc. No. 40: Wilkins Decl. at ¶ 16, 18) ("I was pinned on the ground right outside my cell, and Gaddy was on top of me, punching, kicking, kneeing, and choking me."); (Doc. No. 40-3: Dunning statements) ("I seen officer Getty [sic] pick Inmate Wilkins up in the air and slam him down on

5

his head and fall on top of him . . . with his hand around the inmate[']s neck in a choking position"); (Doc. No. 40-5: Wright statement) ("Wilkins was yelling[,] telling Officer Getty [sic] to stop. Officer Getty then took both of his hands and placed them around Wilkins[']s neck. As I was watching all of this, I could see Wilkins kicking[,] wanting to be released by Officer Getty's choke hold."). Because of the size differential, Wilkins was unable to protect himself from Gaddy's blows. (Doc. No. 40: Wilkins Decl. at ¶ 18).

Wall must have heard the commotion, because he came running up the stairs towards the C-block. (Doc. Nos. 40: Wilkins Decl. at ¶ 19; 40-1: Barker statement; 40-2: Wall statement; 40-3: Dunning statement; 40-4: Kellam statement; 40-5: Wright statement). Gaddy was still on top of Wilkins. (Doc. No. 40: Wilkins Decl. at ¶ 19); (Doc. No. 40-1: Barker statement) ("I looked into C-pod and saw Wilkins on the floor with C/O Gaddy on top of him. C/O Wall was ¾ up the stairs."). Wall removed Gaddy from on top of Wilkins. (Doc. No. 40: Wilkins Decl. at ¶ 19); (Doc. No. 40-5: Wright statement) ("Another officer came in the block, ran up the stairs and had to physically remove officer Getty [sic] off of Wilkins."). Wall asked both Gaddy and Wilkins what had happened, but neither responded. (Doc. No. 40: Wilkins Decl. at ¶ 20; Doc. No. 40-2: Wall statement).

Wilkins states that although DOC policy requires all daily happenings to be logged hourly on the Daily Report for Segregated Inmates (Form DC-141), Gaddy never logged this incident. See (Doc. No. 40-6: 6/13/07 Daily Report of Segregated Inmate Wilkins). Disciplinary proceedings were initiated against Wilkins, but the charges were dismissed "due to conflicting staff statements and lack of evidence." (Doc. No. 40-7: Investigating Officer's Report); see also (Doc. No. 40-8: Offense and Disciplinary Report).

Wilkins suffered physical and emotional injury as a result of Gaddy's assault. He was

6

treated by medical staff at Lanesboro as well as at Anson County Hospital for soft tissue damage in his bruised heel, severe back and neck pain, migraine headaches, and elevated blood pressure. (Doc. Nos. 40: Wilkins Decl. at ¶¶ 24-27; 40-9: Medical Records). Wilkins logged daily migraines following the incident. (Doc. No. 40-9: Medical Records). He was prescribed Toradol, a pain medication, for severe back pain. (Id.). Wilkins also suffered panic attacks and anxiety, and was treated for depression and suicidal impulses. (Doc. Nos. 40: Wilkins Decl. at ¶¶ 24, 28; 40-9: Medical Records). Wilkins was depressed, in particular, because he felt like no one cared about the abuse he had suffered, and because he felt that Gaddy's lack of consequences for the attack proved that Wilkins was "irrelevant, like [he doesn't] even exist." (Doc. No. 40: Wilkins Decl. at ¶ 28). Following a suicide attempt on August 18, 2007, Wilkins was prescribed Celexa and Elavil for depression. (Id.; Doc. No. 40-9: Medical Records).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

To state an Eighth Amendment claim, an inmate must demonstrate(1) that objectively the deprivation suffered, or harm inflicted, "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir.1998) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). When an inmate claims that a prison official used excessive force against his person, the proof required is less demanding for the objective component and more demanding for the subjective component. See Williams v. Benjamin, 11 F.3d 756, 761 (4th Cir. 1996). With respect to the objective component, the inmate must demonstrate that the "nature" or amount of force employed "was nontrivial." Wilkins v. Gaddy, 130 S. Ct. at 1179. With respect to the subjective component, the inmate must demonstrate "'wantonness in the infliction of pain.'" Iko v. Shreve, 535 F.3d 225,

8

239 (4th Cir. 2008) (quoting Whitley v. Albers, 475 U.S. 312, 322 (1986)).

A. Objective Component

With regard to the objective component of an excessive force claim, the Hudson Court stated:

> When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. See Whitley, 475 U.S. at 327. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

503 U.S. at 9 (citation omitted). However, the Hudson Court noted, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (quoting Whitley, 475 U.S. at 327).

Gaddy's version of events differs markedly from Wilkins's. According to Gaddy, on June 13, 2007 at 1:40 pm, Wilkins stated something to him that he did not hear, so he opened Wilkins's "trap door to better communicate with inmate and to cuff [him] for rec." (Doc. No. 38-1 at 85: 6/19/07 Gaddy Statement); see also (Doc. No. 38-1 at 81: 6/18/07 Gaddy Statement) (stating same). But see (Doc. No. 40-6: 6/13/07 Daily Report of Segregated Inmate Wilkins) (showing that Wilkins had already gone to recreation earlier in the day). Gaddy alleges that Wilkins then made gestures and stated "come in here I will f*ck you up" to which Gaddy replied "is that a threat?" (Doc. Nos. 38-1 at 81: 6/18/07 Gaddy Statement; 38-1 at 85: 6/19/07 Gaddy Statement). "Gaddy then turned to Officer Wall to ask advice, turned back around cell C-2 was opening." (Doc. No. 38-1 at 81: 6/18/07 Gaddy Statement); see also (Doc. No. 38-1 at 85:

9

6/19/07 Gaddy Statement) (stating same).  But see (Doc. Nos. 40-2: Wall statement; 40-1: Barker statement) (indicating that Wall was downstairs and was not with Gaddy at this time). Gaddy states that Wilkins "threw objects that struck C/O Gaddy in face and charged wildly.  C/O Gaddy restrained and placed inmate on floor.  Inmate began to laugh and stated 'you got me haha' while being escorted back to cell by C/O Gaddy and C/O Wall without further incident." (Id.); (Doc. No. 38-1 at 85: 6/19/07 Gaddy Statement); see also (Doc. No. 38-1 at 81: 6/18/07 Gaddy Statement); (Doc. No. 40-2: Wall statement) ("I/M Wilkens was laughing and I asked what was going on both of them was silent").

  According to Wilkins, Gaddy assaulted him maliciously and sadistically, and he did so without provocation or cause.  (Doc. No. 39 at 10-11).  Specifically, Wilkins states that he asked Gaddy to give him a grievance form, (Doc. No. 40: Wilkins Decl. at ¶ 6), and Gaddy responded to Wilkins by shouting: "Keep running your f*cking mouth and I'll come down there and beat your a**!  I'll pop your door, and I'll beat your a**!"  (Id. at ¶ 10).  Wilkins alleges that Gaddy approached his cell, "saying stuff like: 'I'm back now! What's this sh*t you was talking about? I'm gonna f*ck you up.'"  (Id. at ¶ 11).  Gaddy then signaled for the control booth officer, Barker, to open Wilkins's door, which he did.  (Id. at ¶ 12); (Doc. No. 40-1: Barker statement) ("I, C/O Barker, was in control room when C/O Gaddy signal for me to open cell door C-2 in C-Pod.  I, C/O Barker, looked up into C-pod and saw that C-2's trap door was opened.  I then opened cell C-2.").  As the cell door opened, Gaddy immediately grabbed Wilkins, picking him up in the air, and throwing him down onto the ground outside of cell C-2.  (Doc. No. 40: Wilkins Decl. at ¶ 16).  Wilkins states: "I was pinned on the ground right outside my cell, and Gaddy was on top of me, punching, kicking, kneeing, and choking me."  (Doc. No. 40: Wilkins Decl. at ¶ 16, 18).  Wall came running up the stairs towards the C-block, found Gaddy on top of Wilkins,

and removed him.  (Doc. Nos. 40: Wilkins Decl. at ¶ 19; 40-1: Barker statement; 40-2: Wall statement; 40-3: Dunning statement; 40-4: Kellam statement; 40-5: Wright statement).  Finally, according to Wilkins, Wall asked both Gaddy and Wilkins what had happened, but neither responded.  (Doc. Nos. 40: Wilkins Decl. at ¶ 20; 40-2: Wall statement).

Wilkins argues that Gaddy used excessive force when he picked Wilkins up in the air and threw him down on the cement floor and then climbed on top of him, "punching, kicking, kneeing, and choking" him.  (Doc. No. 40: Wilkins Decl. at ¶ 16, 18); see also (Doc. No. 40-3: Dunning statements) ("I seen officer Getty [sic] pick Inmate Wilkins up in the air and slam him down on his head and fall on top of him . . . with his hand around the inmate[']s neck in a choking position"); (Doc. No. 40-5: Wright statement) ("Wilkins was yelling[,] telling Officer Getty [sic] to stop.  Officer Getty then took both of his hands and placed them around Wilkins['] neck.  As I was watching all of this, I could see Wilkins kicking[,] wanting to be released by Officer Getty's choke hold.").  Assuming Wilkins's version of the facts for purposes of this Motion, Wilkins has demonstrated that the "nature" or amount of force employed by Gaddy "was nontrivial," Wilkins v. Gaddy, 130 S. Ct. at 1179, thus satisfying the objective component of the excessive force analysis.

B. Subjective Component

In a claim for excessive application of force, a plaintiff must meet a heavy burden to satisfy the subjective component.  See Whitley, 475 U.S. at 325.  "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Whitley, 475 U.S. at 320-21 (quotation omitted).  As the Supreme Court noted in Hudson, "corrections officers must balance the need

11

'to maintain or restore discipline' through force against the risk of injury to inmates." 503 U.S. at 6.

To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." Wilson, 501 U.S. at 297. In a claim for excessive force, that state of mind is "wantonness in the infliction of pain." Whitley, 475 U.S. at 322. The Whitley Court set forth four factors for district courts to consider in determining the subjective question of "whether the use of force was wanton and unnecessary:" (i) "the need for the application of force," (ii) "the relationship between the need and the amount of force that was used," (iii) the threat reasonably perceived by the responsible officials, and (iv) "any efforts made to temper the severity of a forceful response." Whitley, 475 U.S. at 321 (quotations omitted).

Viewing the facts in the light most favorable to Wilkins, there are genuine disputes about several material facts concerning whether Gaddy had any need to apply force to Wilkins, see Whitley, 475 U.S. at 322 (force is "necessary" when it is "needed to preserve internal order and discipline and to maintain institutional security"); whether Gaddy reasonably perceived Wilkins to be a threat; and whether Gaddy made any efforts to temper the severity of his forceful response. The parties' competing narratives constitute a genuine factual dispute that matters. See Orem v. Rephann, 523 F.3d 442 (4th Cir. 2008) (affirming denial of summary judgment where officer's repeated use of taser on unruly arrestee was wanton and sadistic); Kane v. Hargis, 987 F.2d 1005, 1009 (4th Cir. 1993) (affirming denial of summary judgment where there were genuine issues of material fact regarding officer's use of force in effectuating arrest); see also Watson v. Brown, 446 F. App'x 643 (4th Cir. 2011) (unpublished) (holding that fact issue remained whether prison official applied force maliciously and sadistically for purpose of

12

causing harm, thus precluding summary judgment on claim of excessive use of force).

### C. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for violations of constitutional rights that were not clearly established at the time of the challenged conduct." Iko v. Shreve, 535 F.3d 225, 233 (4th Cir. 2008) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). It is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341(1986).

"'[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting ... the plaintiff's version of the facts.'" Iko, 535 F.3d at 230 (alterations in original) (quoting Scott v. Harris, 550 U.S. 372, 378 (2007)). When assessing a motion for summary judgment in a qualified immunity case, the Fourth Circuit has cautioned that:

> When resolution of a case depends on determining what actually happened, "the issue is inappropriate for resolution by summary judgment." Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir. 1992). This is because "[d]isputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context." Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995) (citing Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992)). Accordingly, "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." Id. at 359-60 (citations omitted).

Vathekan v. Prince George's Cnty., 154 F.3d 173, 179-80 (4th Cir. 1998) (alteration in original).

As discussed above, a clear dispute of facts exists in this case. "Because this dispute of facts 'regard[s] the actual conduct of the defendant[],' summary judgment on qualified immunity grounds is improper." Joyner v. O'Neil, No. 3:10-cv-406, 2012 WL 560199, at *9 (E.D. Va.

13

Feb. 21, 2012) (quoting <u>Vathekan</u>, 154 F.3d at 180) (quotations and citations omitted).

Accordingly, Defendant's Motion for Summary Judgment is **DENIED**.

IV. **CONCLUSION**

**IT IS, THEREFORE, ORDERED** that Defendant Gaddy's Motion for Summary Judgment, (Doc. No. 38), is **DENIED**.

Signed: March 12, 2012

Robert J. Conrad, Jr.
Chief United States District Judge